Morning and welcome to the 11th Circuit. Judge Pryor and I are so pleased to welcome to our bench today and this week Judge Kenneth Ripple from the 7th Circuit Court of Appeals. We're very privileged and honored to have him joining us and he's helped us out a lot in the past and we're happy to have him here with us today. Welcome. Alrighty, we're going to get started with the United States v. Patrick Heard. Good morning. May it please the Court? On March 2, 2014, Patrick Heard was stopped and then the officers did not have reasonable suspicion that Mr. Heard was engaged in criminal activity and so the stop and the subsequent search violated his rights under the Fourth Amendment. I've raised two issues on appeal. First, the unconstitutionality of the search and second, the government's violation of the rule of sequestration. Unless the panel directs me otherwise, I intend to address the reasonable suspicion issue first. For a stop like this, in order to satisfy the Fourth Amendment under the totality of circumstances, the detaining officer must have a particularized and objective basis for suspecting an individual of legal wrongdoing. Counsel, the district court assumed that the Terry stop began when Officer Bisker asked for permission to search Mr. Heard. Do you agree that that's the moment when the stop began? I would agree with that, Your Honor. I think that that is a reasonable point to consider the search, excuse me, the stop to have begun. And what's your best authority to support that a reasonable person in Mr. Heard's situation at that point in time would not have felt free to terminate the interrogation or the interaction? Excuse me, Your Honor. I think in this case, it's demonstrated by the facts of what happened next. The testimony in the evidentiary hearings supported that after that point, Mr. Heard indicated that he wanted to go inside and clearly did not feel free to do so. He said, I just want to go back in. I want to go back into my house or into the house and did not feel free to do so. So I think in this case, it's demonstrated by the facts and circumstances here. And also that this entire encounter from the moment when the officer first interacted with Mr. Heard until he was on the ground and under arrest was under four minutes. So all of these events are very close in time as well. So you don't have a case that's analogous to the facts here? No, Your Honor, not to hand. Thank you. But I do think that the facts itself show that he did not feel free to leave because he indicated that he wanted to and wasn't able to. The totality of the circumstances here do not support a finding of a reasonable suspicion as to the stop nor to the subsequent search. And as I've argued, the district court clearly erred in its factual findings as to several matters. But even if it did not clearly err, the totality of the circumstances don't meet the Fourth Amendment standards here. And I think it might be useful to look at what the totality of the circumstances are in this moment. A security guard had seen a group of young men on foot enter a wooded area. Several minutes later, that security guard heard shots fired from that area, briefly went to investigate and then called 911. Police reported to the apartment complex and they met with that security guard. And they spoke with that security guard for several minutes. So at the time that several minutes had passed between the time of the shooting, the time of the call, and then, of course, the reporting of the officer. The officer spoke with the guard for several minutes, at which point the guard described why he had called police, what he had seen, what happened. Thereafter, the officer got back into his car and drove around the parking lot before encountering Mr. Hurd. Mr. Hurd was in a yard area, a grassy area between an apartment building and the adjacent parking lot. At 7 o'clock in the evening, he was walking his dog. At the time that the officer encountered him, according to all testimony, it was between 15 and 27 minutes after the shots had occurred. Mr. Hurd is standing there. And at the time the officer encounters him, Mr. Hurd has seen the officer's car driving around the parking lot. The officer is in uniform and in a marked car. He has seen the officer stop his car, get out of the car, and approach. Mr. Hurd had every opportunity to flee or to leave the scene, and he didn't. He stayed there. And in fact, when the officer got out of his car to engage with Mr. Hurd, Mr. Hurd voluntarily walked over to him in order to answer the and to interact with him. Mr. Hurd did in fact respond to the questions, including describing that he too had heard gunshots. He indicated that the gunshots had come from the same wooded area as the security guard. So the two stories from two different witnesses corroborated each other. Mr. Hurd was asked for identification and he provided identification. And at some point, the officer asks where Mr. Hurd, you know, where Mr. Hurd and pointed to the building that he is standing immediately outside of. Now, obviously, from the briefing, there was some confusion about whether or not the officer asked Mr. Hurd for his mother's apartment complex. And the district court found that he did, and that Mr. Hurd did not answer that question. But I think it's important to note that Mr. Hurd did not say, I'm not going to answer that question or I can't answer that question, but merely responded to that question with a question of his own or by changing the subject in a way that that was arguably evasive. Though, if he had refused to answer the question, would that have been something we could have considered? I mean, can we consider the fact that that somebody just refuses to ask a question during a consensual encounter? Your Honor, I would not say that refusing to answer that question would give rise to reasonable suspicion, but would point out that that is not the facts of what happened here. The, it's also clear that at some point the second officer arrives, and it's unclear whether that officer arrives prior to or after the first officer asked where Mr. Hurd lived. But the second officer arrives on the scene. So now we have a scenario where on the scene are two armed uniformed police cars, two marked, excuse me, police officers, two marked police cars, and then within sight, a uniformed security guard also in a marked car, and then Mr. Hurd. So that, that's the scenario here in this residential area. There's no question that there was plenty of light. The officers were able to read the identification of the security guard, were able to read Mr. Hurd's identification. One officer indicated that he looked into the floorboard of a car that was 15 to 20 feet away and was able to clearly verify that there was no one in the car posing any danger, clearly could see to the floorboard. Everyone indicated no ability, no obstruction or inability to see in the light that was available. And there were no exigent circumstances present. Again, at the onset were 15 to 27 minutes after the shots were fired in a separate area in the, in the woods, and there had been no additional criminal activity. Police at that point had been on the scene during the entire time that they spoke with the police car, excuse me, the security guard and drove through the area, and there was no evidence of any other criminal activity afoot. And then at that point is when Officer Bisker asked to pat down Mr. Hurd. And again, that is what the point where the district court concluded that the stop occurred. At that point, under the totality of the circumstances, even considering all of the circumstances, the fact that it was seven o'clock at night, the fact that, that the officers testified that they believed that it was their understanding because they had been called to various police calls at the apartment complex in the past, that they perceived it to be a high crime area. In addition, the totality of the circumstances also includes all of those factors that weigh against any finding of reasonable suspicion. Now, he asked to your client whether he could, he would, he would mind being patted down. Am I right? He didn't say, I'm going to pat you down. He asked if he, he in some way asked for permission. The language of that request is not clear on the record, Your Honor. But yes, he did ask. Was a request. So apparently the officer, was he just, was he being polite or he felt he needed to ask at that point, right? Your Honor, I'm not sure that the officer felt he needed to ask so much as he was informing Mr. Hurd of his intentions. I have some difficulty with your characterizing the stop as involuntary when the ask was made. It seems to me that's precisely what an officer would do if he were talking to someone and felt in any way in jeopardy because the other person might be armed. He said, do you mind if I pat you down? I really, Frank, I'll be talking to the government about this, but I don't understand why the government's conceding that. Well, Your Honor, again, I, I, It seems to me like a very voluntary kind of a thing. The officer was respecting the man's rights. I, I think that at that point, the reason for finding that, that the search, excuse me, that the stop began at that point is because of Mr. Hurd not feeling, no longer feeling that it was voluntary by the fact that he indicated he wanted to leave and did not feel free to do so. Additionally, according to the testimony, the next, the next statement by the officers were for him to put his hands up. So even if the, the panel were to. What was, Mr., what was your client's reaction to the question? To being, the request to. Let's talk about that before we talk about what the officer did. What did he, how did your client react to the question? So Mr. Hurd's response was to ask what he, according to the testimony, he asked what he was doing wrong. He asked why they were, why they were doing this. He said he wanted to go back inside. And so he responded in a way that, that was basically, why are you hassling me? Why are you bothering me? And there's also testimony that he physically responded by appearing to be under stress. Okay. So that happened. Then what did the officers do? Well, the testimony is a little unclear on this, whether one, one officer testified that he instructed Mr. Hurd to keep his hands down. The other officer testified that he, Mr. Hurd was instructed to keep his hands up. At some point he was instructed to either keep his hands up or keep his hands down. The district court make any precise findings as to the precise sequence of events. I believe that. Your client reacted to the officer's request. Excuse me, Your Honor. I apologize for interrupting. The findings of the district court were that the officers told him to put his hands down and then put his hands up. In that sequence. I see. And so I think even if the panel were to disagree that the stop occurred at the time that the officers asked for permission to search, I don't think there could be any question that at the latest it stopped at the time that Mr. Hurd was instructed to keep his hands down. It made me a very big difference though, right? Because in the interim, your client reacted rather, well, he reacted, he did something more than simply say to the officer, no, I don't want to be patted down. He acted fairly defensively, didn't he? Your Honor, the testimony was that he looked uncomfortable and that he asked what he was, why they were bothering him, why, you know, why they were doing this. It is, again, I would argue that that also does not create, does not establish objective reasonable suspicion. He had the right to refuse the search at that point. And the mere fact of him declining or refusing to consent to the search does not constitute reasonable suspicion. But isn't the manner of his refusing something the officer could take into consideration? Excuse me. I think it could be taken into consideration, but Your Honor, it still has to be considered in the totality of the circumstances. And when we have a situation here where this is a man who is standing in a residential area in the early evening, engaging in lawful activity of walking his dog, he has voluntarily, at least initially, voluntarily served as a witness to the police officers. His story has been corroborated and he has been cooperative up to that point. You know, that is the entire view where then when he is, you know, from his view, presumably seemingly out of nowhere, asked to search, says, you know, no, what am I, why are you asking me this? I want to leave. And so that alone does not tip the scales to reasonable suspicion. And I would point out that the Supreme Court has discussed both in and in Westby that in looking at the totality of the circumstances, some factors are more probative than others of reasonable suspicion. And I would note that the factors that the government relies upon on appeal and the district court relied upon are primarily related to external circumstances, not to Mr. Hurd himself. Thank you, counsel. You reserve four minutes. Yes, thank you. I apologize. That's all right. Good morning. May it please the court. I'm Kim Damers. I was the assistant United States attorney that handled this case below. The district court correctly found factually that this was a high crime area. It was dark. The officer was answering a shots fired call. When he got to the location where the shots were heard, he sees one person, Mr. Hurd. He goes up to Mr. Hurd and he says, well, basically, what are you doing here? Mr. Hurd indicates that he lives there or his mother lives there. And he points to an apartment building. Now, the district court found correctly that when asked whether what apartment his mother lived in or where exactly his mother lived in, Mr. Hurd did not answer that question. He refused to answer. He also presented identification to the officer. Let me ask you just the refusal to answer that question. Is that is there something about that that allows you to draw reasonable suspicion? It is a factor in reasonable suspicion. I was under the impression that if it's a consensual encounter, that person is well within his or her rights to refuse to answer a question. Yes, but but the officer is allowed to to take that inability. Now, the testimony was that he didn't know whether Mr. Hurd was unable to answer it or unwilling to answer. It was met with silence. In other words, well, well, actually, I read through the transcripts and my recollection is that there's not a specific factual finding by the district judge about whether it was met with silence or what, but that Dilworth testified that he answered by saying, oh, why you got to do this or something like that. In the transcript, Officer Dilworth on page 80 says that Mr. Hurd was, Bisker was asking clarifying questions and the defendant refused to provide answers to that. And also on page 95. But if you go through it further and then I can't remember whether you asked or counsel for Mr. Hurd asked or the court asked, but somebody asked him, well, what was he saying? And the answer was something to the effect of why you got to do this. What are you doing? Something like that. I guess you could, it's undisputed that at the very least he was being evasive in his answers. And so I believe that evasiveness is in fact a factor. And that is a factor, in fact, the Supreme Court held that it was a factor in Devin Peck v. Alford, a 2004 case where the answers were untruthful and evasive. So you have to, if you decide that you, well, there's nothing untruthful. Correct. This is evasive. So just to make sure I understand what you're saying, your position is if you don't want to answer an officer's question during a consensual encounter, you have to say, I don't want to answer that question. You can't answer, you can't refuse to answer in a different way. Is that what your position is? I just want to make sure I understand. I think, I do not think that it has to be an explicit, I do not want to answer. But I think here in the totality of the circumstances and not taking that factor isolated, which I think in the recent Supreme Court case, Wesby reminds that it is not, you can't look at these factors in isolation. So Mr. Hurd. Well, Wesby is also a qualified immunity case. It is, but it dealt with probable cause for the arrest. I mean, the court did find that there was probable cause for arrest. There's not probable cause here. Your point is there's reasonable suspicion. A lower standard. Correct. So the officer is confronted with Mr. Hurd, is speaking with Mr. Hurd in a consensual relationship in the beginning, right? They're having a consensual conversation. Mr. Hurd does not answer where he lives. He presents identification that shows not the address that they are at, 1250 West Park Drive. It is a different address or it is no address, but it is not that address. By this time, Officer Dilworth has arrived on the scene and he hears, and he's a much more experienced officer. He hears Mr. Hurd being very evasive with the dialogue. That's his description of what was said, but when he's actually asked what was said, he says that Mr. Hurd said, why you got to do this, right? Correct, but he's not responding to any of the questions. Officer Dilworth says that Bisker is asking clarifying, simple questions. Do you live here? Does your mother live here? What about that car with the broken windshield? Is that yours? And Mr. Hurd is not responding to any of those. So I believe while one of those, one evasive... I don't recall there being a factual finding about being asked about the car with the broken windshield, but again, I could be mistaken. That's a transcript, not necessarily the court's finding. The court's finding was that there was a vehicle with a broken windshield nearby. True, but there's no indication that Mr. Hurd had any relationship whatsoever to the car with the broken windshield and he's walking a dog. So I mean, wouldn't common sense suggest that he did not show up in the car with a broken windshield? There is no close tie to the car with the broken windshield. There's no tie at all, in fairness. There is no tie, correct. But there is an inference that the windshield could have been broken out. I mean, he has a smashed windshield by the bullet. There is a smashed in windshield on the car. I don't think it's beyond the pale. So it's the mere presence of the car. Yes. So there's a presence of the car. And now with regard to the dog, there is a dog there. There is no leash. Where is that in the record? The absence of a leash makes sense because Mr. Hurd... So we have to infer it. Yes, but it's a reasonable, absolutely reasonable inference because Mr. Hurd's hands are very animated around his waistband. There's no indication from anywhere that there is a leash, which I think you would hear if there was in fact, he was walking a dog. I think there was a dog there. Oh, Mr. Hurd also told the officers he was walking his dog. Right. That that was his dog. He said, this is my dog. But it's not your position that he wasn't walking a dog. So what difference does it make if there was a leash? I think it just makes it a closer tie to the dog and Mr. Hurd if there's a leash. I'm not exactly sure what's going on with the dog, but there is definitely a dog present at the scene. There's some... Isn't that also one of the factors we have to consider in the totality of the circumstances, that he does in fact appear to be walking a dog? There is a dog there. He says, this is my dog or I'm walking this dog. The mere fact that there is a plausible explanation doesn't negate the reasonable suspicion in this case. Well, I agree that the mere fact that there's a plausible explanation does not necessarily negate reasonable suspicion if it exists, but you still have to get to the point where there is reasonable suspicion. And I think you are here because this is the nature of the call. It's dark. You're in a remote area. Mr. Hurd is... But there are several apartment buildings right nearby. There are. And it's 15 to 27 minutes after the shots were heard. That's correct. And he's standing there with his dog. And although the officer has approached him, he has in turn walked towards the officer, hasn't fled, seems to be cooperative. Until the officer says, exactly where does your mother live? And he does not respond. And he presents identification that does not match. Well, that was still cooperative. He was asked to present identification and he did, right? He can't help what's on the identification. If it doesn't have his address on it, it doesn't have his address on it. But it does raise the fact that does this person belong here? Is he involved in the shots fired call? Here you're at... Well, let's say he didn't belong there. Let's say it wasn't really... He didn't really live there. It wasn't his apartment complex. What is the particularized evidence that points to Mr. Heard as a suspect, other than the fact that he happens to be in a place where he has a reason for being, at least as articulated? So the officers are engaging into finding out why he is there. Because it appears to be that he doesn't belong there to them. He doesn't belong there because he can't say where his mother lives or won't say where his mother lives. And because his identification does not show that he belongs there. So now they are faced with somebody who is in a place where he's maybe not supposed to be shortly after shots are heard. So going further with that, as Judge Ripple pointed out, the officer then asks, do you mind if I pat you down? And Mr. Heard says, I didn't do anything. Why are you doing that? Something to that effect. But then he becomes much more animated. Again, there may be a plausible reason for that. But the officers faced with a shots fired call in a high crime area at night have a right to say, OK, now this person is acting much differently. And the district court correctly found that Mr. Heard then became much more animated. He became defensive. His stance was unusual. His hands were animated about his waist. It is a little strange, though, the conflicting statements of the officers, one saying he was swaying and the other saying he was rigid. I mean, that did strike me as a little odd. And I don't think those are inconsistent in this fact. I think what happens, if you remember, in truth, Mr. Heard has a colostomy bag. So he is a rigid, he has a rigid stance. I think you can, rigid doesn't necessarily mean I'm standing still. It means I am unnatural in my stance. So I don't find it inconsistent that you could be standing very rigid and yet sort of swaying back and forth a little bit. I just don't think, their testimony was not on point for everything. There's no doubt about it. Page 28 and 29 of the defense's brief lists all the reasons they were inconsistent. Right, but that's a different issue as to whether there's clear error in the test findings. Correct. I think that's exactly right. There was no description of a suspect, correct? That was never, there was no description communicated to the officers. None at all, including whether there was a description of a group of individuals. So I find it a little bit strange that the district court considered the lack of a description of a suspect to be evidence pointing toward reasonable suspicion. Can you explain that? Well, I think what it does is, it doesn't go against the fact that Mr. Hurd could be a suspect. In other words... But anybody could be a suspect at that point. Correct. So it doesn't point to Mr. Hurd. It doesn't point to Mr. Hurd, but it doesn't, it doesn't, it would be less reasonable suspicion, for instance, if in fact a description had been given, white male, five foot five. Mr. Hurd would not have fit that description, and so it becomes less reasonable suspicion. In this case, there is no description other than the security guard says, the shooting occurred around this wood line, which is where Mr. Hurd, the district court found, is in the area of where the shooting occurred, at some time within 15 to 20 minutes, 15 to 27 minutes after the shooting. Okay. Defense counsel did not discuss the sequestration issue. I'm happy to discuss that if the court wishes. If not, I'll see the rest of my time, unless there are other questions. Thank you. Counsel. I wanted to address the question of whether the police officers had been provided with a description of the suspect, because what was just represented was that there was no, no description, and that's actually inaccurate. Judge Duffy's findings, the district court's findings, included that in regards to the conversation between the security guard, Mr. Sanders, and the first reporting officer, the district court's fact findings were that there was a conversation of about three or four minutes, and that it was unclear whether the security guard had mentioned the group of men who'd walked past him moments before the gunfire. And the district court cites to the fact that there was conflicting testimony as to that. There had been testimony at the first evidentiary hearing that such a description was provided. The responding officer could not remember any of the contents of that conversation at the initial evidentiary hearing. At the second evidentiary hearing, he recalled that he had asked the security guard for identification, but otherwise, again, had no recollection of what that conversation was. But there was mixed evidence on that issue. And I think looking at the facts here, this is the security guard who called 911 to report the crime. He then made himself available to meet with the officer when the officer arrived. When the officer arrived, the officer got out of his car and they stood outside of their vehicles and had a conversation for several minutes about the facts of what the call was. So I think there is no reasonable conclusion other than that the guard described the events that led up to him calling the police officer. So I would argue that there's no reasonable conclusion other than that he had provided a description of the suspects. And there certainly is no factual finding at the district court or by the district court that no description was given. So presumably, I would argue that the description was given. But even if it was not, if the panel were to find that it was not, then at worst, there is no description of the suspects. And again, the description of the suspects in no way met Mr. Hurd's physical description. They were a group of three or four young men and they had traveled into the woods and not come out of the woods, whereas Mr. Hurd is standing alone as an older man. The officers testify that they formed a stance called a safety L around Mr. Hurd. Is there any significance to that as far as when Mr. Hurd might have felt that he had been stopped or that he was not free to leave? Your Honor, again, I think it does create, what it did was it physically trapped Mr. Hurd. He had either his back or his side to the building and then he is surrounded by police officers, one in front of him and one to the side of him between himself and the parking lot. So he was, in fact, physically surrounded at that point. And again, that is the point at which the officer, the first officer asks, you know, indicates that he wants to pat Mr. Hurd down. So I think that that factor contributes to a conclusion that Mr. Hurd was stopped at that point. I did want to briefly touch upon some of the factual findings by the, excuse me, by the district court that were clearly errors because the government relies upon those as arguing that they support in the totality of the circumstances, a finding of reasonable suspicion. And that is the conclusion that this occurred in a remote area. One witness, one police officer made that statement, but that statement was completely shown by all other evidence about where this happened to be absurd. This was a large apartment complex and this interaction happened between a building and the parking lot, which is adjacent to the driveway, within the first four buildings of the complex. It is within view of the gated entrance. The complex went back 21 buildings back, had a lake, had trails, and there were remote areas, but submitted into evidence was at least a partial map of the complex showing that this was not a remote location. It was within view of the entry. Thank you, Ms. Shepard. All righty. Thank you, counsel.